Jefferson Memorial Gardens, Inc., et al. [1] v. Commissioner. Jefferson Memorial Gardens, Inc. v. Commissioner
Docket Nos. 95320, 1705-63, 282-62.
United States Tax Court
T.C. Memo 1966-50; 1966 Tax Ct. Memo LEXIS 229; 25 T.C.M. (CCH) 293; T.C.M. (RIA) 66050; March 11, 1966
*229 Jacquin D. Bierman, for the petitioners. Rudolph J. Korbel and Jack Older, for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined deficiencies in income tax as follows: Tyler Mountain
Jefferson
Hamilton
Memory Gardens, Inc.
Memorial
Memorial
Year
Gardens, Inc.
Gardens, Inc.
F/Y Ended Sept. 30
1956
$14,975.67
1957
$66,325.95
10,382.33
1958
46,458.35
$39,802.32
6,062.04
1959
33,553.99
14,384.39
4,898.47
1960
4,950.13
3,823.85
The only issues for decision are whether the Commissioner erred in: 1. Disallowing as cost of lots sold in each year the amounts accrued in that year as due to holders of "certificates of indebtedness," 2. Disallowing in each year amounts claimed as costs of improvements to the cemetery property, 3. Disallowing cost of grave markers contracted to be sold by Hamilton in 1960. Issue No. 1 is involved for each year in all three cases; 2. is involved for each year in the Jefferson and Hamilton cases only. All stipulated facts are adopted as Findings of Fact. The petitioners contend, inter alia, that they are not a "thin corporation" because *230 they did not need invested capital with which to operate their businesses since sales would supply all needed funds. They introduced testimony intended to support this contention but the stipulated facts show that McCord under his deals with the two corporations, advanced $34,000 in cash to Jefferson and $23,500 in cash to Hamilton, secured only by the borrowers' non-interest bearing promissory notes and Van Splunter loaned $40,500 to Tyler on its interest bearing note. Thus, if it makes any difference, the evidence as a whole clearly indicates that sales were not expected to supply all needed funds and the testimony of the witnesses does not justify a finding of fact to the contrary. The petitioners make an argument based upon their claim that the values of the lands as cemetery lands were many times the amounts which McCord and Van Splunter had paid for them as farm lands. However, authority to use the lands for burial purposes was obtained by the persons who sold to McCord and Van Splunter before the sales took place and the evidence does not show that the values of the lands at the times they were transferred to the cemeteries exceeded the amounts paid for those lands by McCord *231 and Van Splunter immediately before the transfers to the cemeteries. Each petitioner claims that the entire amounts which it accrued in each year as due the holders of its 1,000 "certificates of indebtedness" were costs of the burial spaces sold and must be subtracted in computing its gain from those sales during that year. The Commissioner, in determining the deficiencies, did not allow any of those accruals or any payments made on the "certificates" to be subtracted as costs of burial spaces sold. He has taken the position that McCord and Van Splunter, who made all the payments to purchase the lands, contributed those lands to the corporation for its "certificates" issued to and owned by them and those "certificates," together with those issued to third parties, are not evidence of indebtedness owed as the cemetery's cost of land but represent an equitable interest or investment in the operation of the issuing corporation. Jefferson Memorial Gardens, Inc., hereafter called Jefferson, is an Alabama corporation incorporated on August 25, 1952, operating for profit a cemetery near Birmingham. Its returns were filed with the director for the Alabama district. Hamilton Memorial *232 Gardens, Inc., hereafter called Hamilton, is a Tennessee Corporation incorporated on April 24, 1953, operating for profit a cemetery near Chattanooga. Its returns were filed with the district director at Nashville. Tyler Mountain Memory Gardens, Inc., hereafter called Tyler, is a West Virginia corporation incorporated on September 23, 1953, operating for profit a cemetery near Charleston. Its returns were filed with the director for the West Virginia district. All three petitioners sell and report income from sales of burial spaces and markers on the installment method. Otherwise all three use an accrual method of accounting. Fred W. Meyer, Jr. and Charles R. Bone had had experience in the commercial cemetery business prior to their association with the petitioners. Harry Braverman, a certified public accountant and senior partner of his accounting firm in Newark, New Jersey, had had considerable experience in auditing and advising cemeteries. Braverman suggested to Meyer and Bone that they go into some cemetery operations on their own. The minimum amount permitted by law was subscribed for the stock of the three corporations. The stock was owned as follows at the time when *233 the lands were bought and the "certificates of indebtedness" were issued: Jefferson
Shares
Hamilton
Shares
Tyler
Shares
Fred W. Meyer, Jr.
667
Meyer
1250
Charles R. Bone
667
Bone
1250
Bone
750
Harry Braverman
500
Braverman
1250
Edna Z. Beiner
166
Mrs. McCord
1250
Beatrice Verdier
250
2000
5000
1000 Edna was the wife of one of Braverman's partners. The par value of the shares was $1 in the Jefferson and Tyler cases and 20 cents in Hamilton. The cemetery lands involved herein were paid for solely as follows: Jefferson $73,000, Hamilton $32,000, both amounts paid by McCord, and Tyler $71,500, paid by Van Splunter. "Certificates of indebtedness" were issued by Jefferson and Hamilton and promissory notes were given to McCord as follows: JEFFERSON
HAMILTON
"Certificates"
Notes
"Certificates"
Notes
McCord
400
400
Mrs. Fred W. Meyer, Jr.
200
$14,600
200
$8,200
Mrs. Charles R. Bone
200
14,600
200
8,200
Universal Associates
150
10,950
150
6,150
Edcar Associates
50
3,650
50
2,050
1000
1000
"Certificates of indebtedness" were issued by Tyler and promissory *234 notes were given to Van Splunter as follows: TYLER
"Certificates"
Notes
Van Splunter
360
Mrs. Charles R. Bone
520
$37,180
Beatrice Verdier
120
8,580
1000
No principal amount was mentioned in or in connection with the "certificates of indebtedness" and no interest was payable thereon. The only source of payment on the "certificates" was 25% of the base sales price of burial spaces sold during the first 15 years in the Jefferson and Tyler cases and during the first 25 years in the Hamilton case. The payments to the "certificate" holders were to be made from receipts of the last one-half of amounts due from the sales of spaces. The "certificates" were transferable. They had no voting rights but the holders could levy on the stock and take control of the corporation if it defaulted in its obligations on the "certificates." No interest was payable on the promissory notes last above mentioned and the only source of payment of the principal thereof was the payments due on the "certificates" issued to the makers of the notes. The facts relating to this first issue are sufficiently alike in all three cases so that those in the Jefferson case may *235 serve for the purpose of discussion. Bone and Meyer investigated and selected a city and nearby available land which, from their experience, they believed would be suitable for a profitable cemetery operation. They learned the price at which the owners of the land would sell it. However, the stockholders of the petitioners either did not have or did not want to invest the money required, in each case, to buy the land needed for cemetery purposes, so, in the Jefferson and Hamilton cases they had McCord associate with them. He and Braverman were friends. The stockholders knew that McCord had money which he would like to use to buy the selected land and transfer it to Jefferson and Hamilton under their "certificates of indebtedness" plan. It was understood that these steps would be taken. McCord knew that he might reasonably expect to receive a substantial profit under that plan. All four of the parties may have thought that both the company and McCord would benefit taxwise under that method. The two corporations entered into separate agreements with McCord that the only amounts to be received by the "certificate" holders would be 25% of the base sales price of burial space sold during *236 the first 15 years, in the case of Jefferson, and the first 25 years, in the case of Hamilton, in the operation of the cemeteries. McCord meanwhile had never seen the land or the sellers. McCord paid to the sellers the entire agreed purchase price in each case and deeds were delivered for the land. McCord then transferred the land to the cemetery corporations in exchange for some of their "certificates of indebtedness." All deeds were recorded. The deeds from the sellers were to McCord as "trustee." This was because, for his transfer of the land to the corporations, he was not to receive all of the 1,000 "certificates" to be issued. The arrangement was that four third parties, who had put up no money and were taking no risks, were to receive 600 of the "certificates" and McCord, who had put up all of the money to purchase the lands and was taking all of the risk, was to receive only 400 "certificates." The 600 "certificates" in the Jefferson and Hamilton cases were issued 200 each to the wives of Meyer and Bone, 150 to Universal Associates and 50 to Edcar Associates. Some of the partners in Universal Associates were related to Braverman. Edna Z. Beiner, wife of one of Braverman's *237 partners, was a partner in Edcar Associates. The recipients of the 600 Jefferson "certificates" gave to McCord their non-interest bearing promissory notes in amounts equivalent to $73 per "certificate" or a total of 6/10ths of the cost of the land to McCord. The notes given in the Hamilton case were for a total amount in excess of 6/10ths of the cost of the land to McCord. His wife owned 1/4th of the stock in that corporation. These notes were payable only by the cemetery corporations, out of the 25% of its base sales price of burial spaces due to the "certificate" holders, until the promissory notes were paid in full without interest. This arrangement not only made gifts of the 600 "certificates" to their holders by each cemetery corporation but permitted those holders to receive 6/10ths of all payments due on the "certificates" after the notes had been paid in full, at which time McCord would receive only 4/10ths of those payments. The record does not show why most or any of the "certificates" were issued to others than McCord and Van Splunter, the two persons who had paid the entire purchase prices on the lands. The three corporations paid no dividends on their stock during *238 the tax years here involved. McCord in the Jefferson and Hamilton cases and Van Splunter in the Tyler case did not sell the lands to the cemetery corporations. There was no price stated or agreed upon for any such sale, no payment or statement of any purchase price, no mortgage or other evidence of indebtedness, no fixed or stated amount of any indebtedness, no book entry of any purchase or indebtedness and no debtor-creditor relationship established. Instead there was merely, in each case, a transfer of the land by McCord or Van Splunter at the risk of the business for, 40% in the case of McCord and 36% in the case of Van Splunter of the "certificates," which gave those transferors of the lands an investment, an equitable interest in and at the risk of the business. The other persons, who received 60% of the "certificates" in two cases and 64% in the other as gifts, and did not pay anything for their "certificates" or risk anything in acquiring them and the cemeteries were never indebted to them. The "certificates" were merely a form adopted to enable their holders to share the financial results of the cemetery operation for a period of years along with the stockholders. The 1,000 *239 "certificates" issued in each case were evidence of equity interests or investments in, rather than of debts owed by, the cemetery corporations. These cases are not distinguishable in principle from , affirmed and similar cases. See also Gardens of Faith, Inc., affirming a Tax Court memorandum opinion. The contention of the three petitioners on this first issue is unsound, since the record as a whole shows that none of the "certificates" ever represented evidence of a true indebtedness and, consequently none of the amounts accruing on all of those "certificates" are costs of burial spaces to the issuer. Cf. . , is distinguishable on its facts from the present cases. The Commissioner, in determining the deficiencies against Hamilton, disallowed deductions "claimed for Developments and Improvements Accrued * * * for the reason that all the required conditions for the allowance of this accrual have not been met" and "accordingly" he increased taxable income by $24,891.75 *240 for 1958, $18,359.41 for 1959 and $7,532.47 for 1960. It is not clear, from the notice of deficiencies attached to the petition in the Jefferson case, what the Commissioner did with respect to amounts accrued for developments and improvements by Jefferson but it is alleged in the petition that he erred "by disallowing the cost of improvements to property sold" in a stated amount for each year. The Commissioner concedes in his brief with respect to Jefferson "that in redetermining the amount of development costs deductible by petitioner as cost of cemetery lots sold, it was improper to reduce actual development expenditures for the taxable year 1957 by the amount of development costs accrued by petitioner in the taxable years 1953, 1954, 1955 and 1956 in excess of actual expenditures in such years." The Commissioner in his brief states: Petitioners Jefferson Memorial Gardens, Inc. and Hamilton Memorial Gardens, Inc. determined that 15 percent of the base sales price of cemetery lots sold was a reasonable estimate of its development and improvement costs, and such petitioners accrued as a deduction for cost of cemetery lots sold 15 percent of all lots sales collections in each *241 taxable year. The respondent disallowed such petitioners' claimed deductions for development and improvement costs in the taxable years in issue because such deductions were in reality reserves for estimated expenses, and the respondent determined that petitioners' actual development expenditures for each taxable year in issue should be allocated as an addition to petitioners' cost basis of its unsold cemetery lots at the beginning of each such taxable year in computing gain from the cemetery lots sold during such taxable years. The petitioners have failed to show that the Commissioner erred in his treatment of costs of developments and improvements and, except as conceded by the Commissioner, his allowance of such costs will not be disturbed. In , and , affd. per curiam , similar contentions of the petitioners were discussed and rejected on similar factual bases. An issue contesting the action of the Commissioner with respect to the exclusion of the portion of lots sales collections by Jefferson and Hamilton attributable to perpetual care has been conceded *242 by the Commissioner on page 32 of his reply brief and needs no discussion here. See also a concession by the Commissioner on page 5 of his original brief. The Court assumes that the assignments of error in the Hamilton and Tyler cases relating to net operating loss carryover deductions have been abandoned since no reference to those matters appears in the briefs of the petitioners. Hamilton initiated two types of installment sales of markers on a pre-need basis in January 1960. In one the markers consisted of a granite base carrying a bronze plate. They were all alike except for the inscription on the plate. The other was a marker of bronze only. Hamilton had no outstanding contracts in 1960 to purchase granite or bronze for such markers and it installed no such granite and bronze markers in 1960. It claimed on its 1960 return a deduction of $3,290.32 [2] for cost of granite and bronze markers. Hamilton installed only 7 bronze markers in 1960 at a total cost of $743. It claimed on its 1960 return a deduction of $6,008.83 [2] as cost of bronze sold under pre-need contracts. *243 The Commissioner, in determining the deficiencies for 1960 against Hamilton, explained: The deduction of $9,434.33 for liability for Purchase of Markers Accrued has been disallowed for the reason that it is an estimated expense reserve which is not an allowable deduction. Hamilton assigned this action as error. Hamilton has the burden of proof on this issue and it has failed to show that the Commissioner erred. The stipulated facts show that Hamilton not only had not bought any markers during 1960 to fill pre-need contracts but it had not contracted to buy any; it had not installed any of the combined granite and bronze markers; it had installed only 7 bronze markers under unexplained circumstances; it had no obligation to install any markers until the purchaser had paid the price in full and had requested installation; and all payments by purchasers were to be spread over a period of years. The amounts accrued, which it seeks to deduct, were based upon 1960 prices which might or might not be in effect later when it would purchase markers. No part of any collections on the installment contracts for markers was placed in trust for the purchase of markers. The estimated future *244 costs of markers are not deductible in 1960. The notice of deficiencies in the Jefferson case contains no reference to costs of markers. Jefferson's pleadings contain no reference to markers or costs of markers. No such reference is made in the answers in that case. Thus the pleadings in that case do not raise any issue with repsect to markers or the cost thereof. Nevertheless the stipulation of facts in that case includes statements relating to contracts for the installment sale of markers and the parties argue this point in their briefs. Jefferson initiated two types of installment sales of markers in December 1958. One type was of a granite and bronze marker. All such markers were identical except for the inscription. The other type was bronze only. Jefferson had no outstanding contracts during 1958 and 1959 to purchase and it did not purchase granite or bronze for markers sold on these contracts. No markers were installed under either type of contract until the contract was fully paid and the purchaser had requested installation. In case of default in payment by the purchaser no marker would be installed. None was installed during 1958 or 1959 and no deduction for cost of *245 markers was claimed on the return for 1958 attributable to installment collections during that year. The collections were reported on the installment method. Jefferson claimed a deduction of $35,328.09 on its 1959 return as the estimated cost of bronze related to collections on pre-need installment contracts for bronze markers. It is stipulated that the Commissioner erroneously treated this amount as a perpetual care item and that his action should be treated as a disallowance of an estimated cost of bronze markers related to 1959 collections. The Commissioner regards the liability of Jefferson on markers during 1958 and 1959 as not sufficiently precise to justify an accrual of their future cost. Jefferson is certainly in no better situation in this connection than is Hamilton and has not proved that it is entitled to any deduction for cost of markers under its installment sales contracts. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Hamilton Memorial Gardens, Inc., Docket No. 1705-63 and Tyler Mountain Memory Gardens, Inc., Docket No. 282-62.↩
2. There is a small unexplained discrepancy between the amount disallowed by the Commissioner and the two amounts stipulated to have been claimed as deductions on the return.↩